## A00A0298. FREEMAN v. THE STATE.
### (535 SE2d 349)

PHIPPS, Judge.

A jury found Dwight Freeman guilty of burglary, aggravated assault, kidnapping, and criminal attempt to commit armed robbery. He was sentenced to terms of incarceration for each count, including a life sentence without parole for kidnapping. Freeman appeals, challenging the admission of identification testimony at trial, the admission of evidence of a prior felony conviction at sentencing, and the subsequent enhancement of the punishment for kidnapping. We find no error on any of the issues raised by Freeman, and therefore, we affirm.

Joann Curl, the victim, testified that on May 27, 1998, at approximately noon, an intruder burst into the office trailer of the trailer park she managed. Curl was inside the trailer where she sometimes lived. Angela Anderson, a new employee and resident of the trailer park, was also there working. Curl testified that the intruder, who was wearing a sweater, a stocking over his head, and white socks on his hands, placed a knife at her throat and demanded money.

The intruder forced Curl into the bedroom where he tied her hands. He instructed Curl to tell Anderson where she kept money, and Curl said it was in her truck. Anderson attempted to search the truck, but it was locked. Moments later, Curl's husband arrived, and the intruder dropped the knife and fled out the front door. Curl called the police. She later found a pillowcase in a bathroom of the trailer.

Anderson pled guilty to her participation in the crimes. At trial, she identified Freeman as the intruder and stated that on the morning of the crimes, he had been at her trailer with her husband, discussing plans to rob Curl. She testified that Freeman had acquired the knife and pillowcase from her house and that the sweater and white socks he wore during the crimes belonged to her husband.

Within ten minutes of Freeman's flight from the trailer, police found him in nearby woods. He was holding the shirt that he had worn to Anderson's home earlier that morning. Concerned for his safety, an officer asked Freeman about the knife he was reported to have. Freeman responded that the knife belonged to the woman and that he had left it at her residence. Freeman added, "I done it, I'm sorry." Police later found the sweater Freeman had worn during the crimes between the trailer park and the woods where he was apprehended.

1. Freeman contends that the trial court erred in overruling his motion to suppress the identification of him by Jo Vickers, who lived next door to Curl's office trailer. Vickers testified that on that day a man rattled the handle of her front door. She looked out and saw him standing on her steps, his head covered by a pillowcase with holes cut out for his eyes. When she screamed for him to leave, the man stepped back, removed the covering from his face, and told Vickers that he thought his sister lived there. Vickers testified that she clearly saw his face.

Vickers watched the man walk to Curl's backyard. She telephoned Curl to warn her of a possible intruder but received no answer. She then called Curl's husband and the police. When Curl's husband drove up blowing his truck's horn, the man ran out of Curl's front door. Vickers testified that as the man ran into nearby woods, he passed her, he looked at her, and she took a good look at him.

Vickers testified that she saw the same man again "ten to fifteen minutes" later at a pasture on the other side of the woods. A police officer had taken her there, and she stated that the man apprehended and held in a one-person showup was the man she had seen earlier. A day or two later, Vickers selected Freeman's photograph from a six-man photographic display. Later that day, she again identified Freeman as she viewed him through a glass at the police station. In this second one-person showup, Freeman wore an orange jumpsuit. At trial, Vickers pointed to Freeman as the man she had seen at her trailer and in the pasture on May 27.

Freeman contends that the two one-person showups were impermissibly suggestive and resulted in misidentifications.

> It is error to allow testimony concerning a pre-trial identification of the defendant if the identification procedure was impermissibly suggestive and, under the totality of the circumstances, the suggestiveness gave rise to a substantial likelihood of misidentification.[1]

We first consider whether the identification procedures were impermissibly suggestive and note that we have held that on-the-scene confrontations and identifications are inherently suggestive because of the presentation of a single suspect.[2] In exercising its discretion to determine whether an in-court identification was tainted by a pre-

---

[1] (Citations omitted.) *Miller v. State*, 270 Ga. 741, 743 (2) (512 SE2d 272) (1999).

[2] See *Ferguson v. State*, 221 Ga. App. 415, 418 (1) (471 SE2d 528) (1996); but compare *Collins v. State*, 232 Ga. App. 651, 654 (1) (502 SE2d 498) (1998) (prompt, on-the-scene confrontations and identifications, though inherently suggestive because of the presentation of a single suspect, nevertheless are permissible in aiding a speedy police investigation, and where possible doubts as to identification need to be resolved promptly, such on-the-spot

trial defect, the trial court must examine the totality of the circumstances.[3] The court should consider: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty demonstrated by the witness; and (5) the length of the time between the crime and confrontation.[4] Where evidence supports the trial court's ruling, we will not disturb that ruling.[5]

At the hearing on the motion to suppress, the trial court permitted extensive examination and cross-examination of Vickers and the officer who was present at both showups. Vickers testified that when Freeman removed the pillowcase from his head, she focused on his face and eyes as he stood three feet from her on her doorstep. She watched him walk to the back of Curl's trailer, and within minutes, she saw him exiting Curl's front door. As Freeman ran into the woods, he passed within "probably four or five feet" of her. Vickers identified Freeman in the pasture approximately 15 minutes after she saw him flee the crime scene. She testified that when she viewed him at the pasture, she was approximately 40 feet from him, it was about 12:30 p.m., he was plainly visible, and she clearly saw his face. At the motion to suppress hearing, she pointed to Freeman without hesitation and testified that there was "no doubt in her mind" that he was the masked man who had come to her door, removed the pillowcase from his head, spoke to her, walked to Curl's trailer, exited through Curl's front door, fled into the woods, then stood alone in the two showups afterward. She further described how Freeman had changed his appearance since she had seen him on her doorstep and also identified clothing that he had worn at the time of the crimes. The trial court ruled that testimony regarding the first showup would be permitted but that testimony regarding the second showup would not be permitted.

The record shows that " '[t]he trial court's determination that there was, under the totality of the circumstances, no likelihood of irreparable misidentification is supported by the evidence, is not clearly erroneous, and is therefore affirmed. [Cit.]' [Cit.]"[6]

2. Freeman contends that the trial court erred in admitting a 1973 guilty plea to armed robbery, which formed the basis for the enhanced sentence of life imprisonment without parole pursuant to

---

identifications promote fairness by enhancing the accuracy and reliability of identification, thereby permitting expeditious release of innocent subjects).

[3] *Lowe v. State*, 264 Ga. 757, 758 (2) (452 SE2d 90) (1994).

[4] Id.

[5] Id.

[6] *Ferguson*, supra, 221 Ga. App. at 419 (1).

OCGA § 17-10-7 (b) (2). In *Nash v. State*,[7] our Supreme Court revised the scheme regarding the allocation of burdens of proof in hearings to determine the voluntariness of guilty pleas used in sentence enhancement in a nondeath penalty case:

> [T]he burden is on the State to prove both the existence of the prior guilty pleas and that the defendant was represented by counsel in all felony cases and those misdemeanor proceedings where imprisonment resulted. Upon such a showing, the presumption of regularity is then applied and the burden shifts to the defendant to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea. Defendant can attempt to meet his burden of production with a transcript, with testimony regarding the taking of the plea, or with other affirmative evidence. A silent record or the mere naked assertion by an accused that his prior counseled plea was not made knowingly and intelligently is insufficient. If the defendant is able to present evidence that a constitutional infirmity exists, then the burden of proving the constitutionality of the plea shifts to the State. The State will meet its burden of proof if it introduces a "perfect" transcript of the taking of the guilty plea. . . . If the State introduces anything less than a "perfect" transcript, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three [*Boykin v. Alabama*][8] rights.[9]

During Freeman's sentencing hearing on May 25, 1999, about six weeks prior to the *Nash* decision, the State tendered a certified copy of the guilty plea. Freeman objected on the ground that there was no showing that he made the plea voluntarily and knowingly. The trial court continued the hearing so that the parties could brief the issue. *Nash* was decided on July 6, 1999. When the sentencing hearing resumed on August 12, 1999, after referring to the recent *Nash* decision in its discussion with the attorneys, the trial court ruled that Freeman's prior guilty plea was informed and voluntary, overruled his objection, and admitted the plea into evidence. Relying on *Nash*, Freeman maintains that the record is devoid of any showing that he

---

[7] 271 Ga. 281 (519 SE2d 893) (1999).

[8] 395 U. S. 238 (89 SC 1709, 23 LE2d 274) (1969).

[9] (Citations and punctuation omitted.) *Nash, supra*, 271 Ga. at 285.

knowingly waived his constitutional rights and that, therefore, the trial court erred in considering the guilty plea. We disagree.

Here, the State met its initial burden under *Nash* by proving the existence of the prior guilty plea and that Freeman was represented by counsel. The trial court correctly admitted the plea, and a "presumption of regularity" attached to it. The burden of production shifted to Freeman, who testified on direct that his plea was neither voluntary nor knowing. But on cross-examination, the State elicited his testimony that he committed the offense to which he pled guilty and that he was not forced to enter the plea. Because the record reflects that the trial court considered *Nash* in weighing the evidence, given Freeman's testimony, a remand would serve no useful purpose.[10] We further note that although the parties were operating under previous law during the May 25 hearing, *Nash* was decided more than a month before sentencing[11] and Freeman never attempted to add evidence in light of *Nash*. The trial court did not err in considering the plea and enhancing the kidnapping sentence.

3. Freeman contends that the trial court erred in sentencing him to life imprisonment without parole for kidnapping. Our ruling in Division 2 addresses this contention.

*Judgment affirmed. Johnson, C. J., and Mikell, J., concur.*

DECIDED JUNE 9, 2000.

*Jimmy J. Boatright*, for appellant.

*Richard E. Currie, District Attorney, Alexander J. Markowich, Assistant District Attorney*, for appellee.

---

[10] See *Gillman v. State*, 239 Ga. App. 880, 882-883 (2) (a) (522 SE2d 284) (1999).

[11] Id. at 882 (2) (a) (Under previous law, "once a defendant raised the issue of intelligent and voluntary waiver with respect to prior guilty pleas, the burden was on the State to establish a valid waiver. The State was permitted to carry this burden in two ways: a showing on the record of the previous guilty plea hearing that the defendant was aware of the rights he was waiving and the possible consequences of the plea, or, alternatively, filling a silent record by using extrinsic evidence showing that the plea was knowing and voluntary.") (citations omitted).